IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EVOLVED WIRELESS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil Action No. 15-543-JFB-SRF |
| | ) | |
| HTC CORPORATION and HTC AMERICA, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| EVOLVED WIRELESS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil Action No. 15-544-JFB-SRF |
| | ) | |
| LENOVO GROUP LTD., LENOVO (UNITED STATES) INC., and MOTOROLA MOBILITY, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| EVOLVED WIRELESS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil Action No. 15-545-JFB-SRF |
| | ) | |
| SAMSUNG ELECTRONICS CO., LTD. and SAMSUNG ELECTRONICS AMERICA, INC. | ) ) ) | |
| | ) | |
| Defendants. | ) | |

_____ )

1

EVOLVED WIRELESS, LLC,                )
                                       )
            Plaintiff,                 )
                                       )
      V.                               )      Civil Action No. 15-546-JFB-SRF
                                       )
ZTE (USA) INC.,                        )
                                       )
            Defendant.                 )
_____ )

EVOLVED WIRELESS, LLC,                )
                                       )
            Plaintiff,                 )
                                       )
      V.                               )      Civil Action No. 15-547-JFB-SRF
                                       )
MICROSOFT CORPORATION,                 )
MICROSOFT MOBILE OY and                )
NOKIA INC.,                            )              SEALED
                                       )
            Defendants.                )


## MEMORANDUM and ORDER

This matter is before the Court on the parties' stipulation to stay (D.I. 477 in *Evolved Wireless, LLC ("Evolved") v. Samsung Elecs. Co., Samsung Elecs. Am., Inc.* ("*Samsung*"), No. 1:15cv545),[1] and on reconsideration of the Court's earlier decision (D.I. 447 in *Samsung*, No. 1:15CV545) to defer determination of the parties' cross-motions for summary judgment based on a license or patent exhaustion and the plaintiff's motion for

---

[1] For ease of reference, the Court will refer only to pleadings in *Evolved v. Samsung*, No. 1:15cv545, although there are corresponding similar, if not identical, motions and briefs in the other actions.  Future references to the record will be to filings in the *Samsung* case, unless otherwise noted.

summary judgment on the defendants' counterclaim for breach of contract. D.I. 224 and 226[2]. The Court held oral argument on the matter on September 13, 2019. D.I. 481.

These are related actions for patent infringement. Evolved alleges infringement of certain claims of United States Patent Nos. 7,809,373 ("the '373 patent") and 7,881,236 ("the '236 Patent"). Only the '373 patent is at issue in these motions and is directed to wireless communications. The '373 patent purportedly relates to the handover of a mobile device from one cell tower base station to another cell tower base station in a cellular network. D.I. 1, Complaint at 10. The defendants have asserted license and patent exhaustion as an affirmative defense and they also assert a counterclaim for an alleged breach of Evolved's contractual duty to grant licenses on fair, reasonable and nondiscriminatory ("FRAND") terms.[3] D.I. 68, Answer and Counterclaim at 20, 24.

I.      BACKGROUND

        A.      Procedural History

Earlier in these actions, the Court deferred ruling on the parties' cross-motions motions for summary judgment based on a license agreement and a covenant not to sue and denied the plaintiff's motion for summary judgment on the defendants' counterclaim for breach of contract. D.I. 447, Memorandum and Order. Noting that the record

---

[2] Evolved's corresponding motions for summary judgment in the related cases are: D.I. 205 in *Evolved v. HTC Corp. and HTC America, Inc.* ("*HTC*"), 1:15cv543; D.I. 184 in *Evolved v. Lenovo Corp. and Motorola Mobility, LLC* ("*Motorola*"), 1:15cv544; D.I. 197 in *Evolved v. ZTE (USA) Corp.* ("*ZTE*"), 1:15cv546; and D.I. 197 in *Evolved v. Microsoft Corp.* ("*Microsoft*"), 1:15cv547, and the defendants' corresponding summary judgment motions in the related cases are D.I. 205 in *HTC*, 1:15cv543; D.I. 184 in *Motorola*, 1:15cv544; D.I. 224 in *Samsung*, 1:15cv545; D.I. 197 in *ZTE*, 1:15cv546; and D.I. 197 in *Microsoft*, 1:15cv547. The parties' Stipulation to Stay Proceedings Pending Resolution of Appeals (D.I. 432 in 1:15cv543; D.I. 394 in 1:15cv544; D.I. 477 in 1:15cv545; and D.I. 397 in 1:15cv546; D.I. 415 in 1:15cv547). The Court's ruling applies with equal force to those motions in the related cases.

[3] The breach of contract counterclaim is based on obligations imposed on members of Standard Setting Organizations to license standard essential patents.

contained only heavily redacted copies of the Licensing Agreement and amendments, the Court found it had no competent evidence as to either parties' position. *Id.* at 20. Because the defendants' motions involved contract interpretation and an equitable remedy—issues of law—the Court stated it would conduct a bench trial on the issue following the jury trials on infringement and invalidity issues. *Id.* The Court also found "[t]he real significance of a FRAND obligation is as a measure of damages for infringement of a "standard essential patents" ("SEPs") patent" and it "determines the reasonableness of a royalty or license[.]" (*Id.* at 16-17). The Court found the breach of FRAND counterclaim "comes into play only on a finding of infringement, and then only if the plaintiff's demand exceeds the amount the jury determines is the reasonable royalty as measured by the FRAND." *Id.* at 17. The breach of FRAND issue is connected to the license/patent exhaustion defense that involves a license agreement between Evolved's predecessor, LGE, and Qualcomm, Inc. ("Qualcomm"), the supplier of a component of the defendants' accused products.

The related case of *Evolved Wireless, LLC v. Apple, Inc. ("Apple")*, No. 1:15cv542, was tried to a jury from March 26, 2019 to April 4, 2019, and resulted in a finding of no infringement and a verdict in favor of Apple (D.I. 519 in *Apple*, 1:15cv542[4]). That action is now on appeal to the Federal Circuit Court of Appeals. D.I. 549 in *Apple*, 1:15cv542, Notice of Appeal, Appeals Court Case No. 19-2362. The parties have moved to stay the present actions pending that appeal. D.I. 477 in 1:15CV545. It appears appropriate to consider the issues that were held in abeyance at this time. To the extent that there

---

[4] The Court dismissed Apple's defenses of license and patent exhaustion without prejudice to reassertion (D.I. 541).

remain issues that are not resolved in this Memorandum and Order, the Court finds the motion to stay should be granted.

The issue for resolution is whether downstream manufacturers are protected from this infringement suit by a licensing agreement executed by LG Electronics, Inc. ("LGE"), the original patent owner, and Qualcomm LLC, a chip maker. The defendants contend that the licensing agreement bars infringement claims with respect to the defendants' accused products that incorporate the Qualcomm chipsets. They also assert that, even without the Agreement, the infringement actions are barred by the doctrine of patent exhaustion.

B.    Additional Discovery

A threshold issue is whether further discovery is necessary before the Court can resolve the licensing issue. The record shows Evolved is a successor to TQ Lambda, LLC ("TQ Lambda"). TQ Lambda purchased the '373 Patent from LGE in 2014. In support of their motions, the defendants have submitted heavily redacted copies of a series of contracts executed between LGE and Qualcomm ███████████████ D.I. 227, Declaration of Michael D. Jay ("Jay Decl."), Exhibits ("Exs.") A-O. The contract between LGE and TQ Lambda is also in evidence. D.I. 227, Jay Decl., Ex. J, Patent Purchase Agreement ("PPA"). At the hearing, the parties each conceded that the terms of the contracts and licensing agreements at issue are not ambiguous, the contracts could interpret without resort to parol evidence, and the motions could be decided as a matter of law from review from the text of the contracts at issue. D.I. 481, Transcript ("Tr.") at 37, 42, 70, 80[5].

---

[5] Evolved qualified its concession with the proviso that, if the court were to consider Qualcomm evidence on the issue, it reserved the right to conduct discovery with respect to LGE. The Court did not consider the

As noted, the documents submitted to the Court in support of the motions are heavily redacted.  The parties have now assured the Court that redacted portions of the Agreements would not affect the determination of this issue.  D.I. 448, Tr. at 59.  The record shows that Qualcomm produced the redacted documents to both parties at the defendants' request.[6]  *Id.* at 58-59.  The documents were authenticated by a Qualcomm representative.  *Id.* at 60.  The defendants are satisfied that the unredacted portions of the agreements are complete as they are relevant to this case.  *Id.* at 59.  Counsel for Evolved stated at the hearing that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* at 43-50;  D.I. 349-1, Deposition of Mark Roche at 124.  Counsel stated that it was his understanding that the documents filed in these actions in support of the defendants' motions are largely consistent with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* at 15.  The Court is satisfied that the documents, as redacted, represent what TQ Lambda bought when it purchased the patent portfolio from LGE.  The terms of the contracts at issue are not ambiguous.  The Court finds that no further discovery is necessary and the defendants' motions are ripe for consideration at this time.

---

Qualcomm testimony, nor did it consider Declaration of Younghan Song, which had been the object of a motion to strike by the defendants (D.I. 365).

[6] The license agreements have been the subject of much dispute in discovery.  In February 2018, United States Magistrate Judge Fallon denied Evolved's request to seek discovery from LGE, finding that even though Evolved knew of the 1993 SULA Agreement, it did not "disclose the existence of the 1993 Agreement to defendants during fact discovery, despite knowing that defendants pursued discovery regarding the Qualcomm-LGE license agreements for month since at least March 2016."  D.I.356 in Apple, No. 1:15cv542.

C.      Technological Background Generally

Some background facts are gleaned from recent litigation involving Qualcomm. *See Fed. Trade Comm'n v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2019 WL 2206013, at *3 (N.D. Cal. May 21, 2019)* ("*FTC*");[7] *In re Qualcomm Antitrust Litig.*, No. 17-MD-02773-LHK, 2018 WL 4110498, at *1 (N.D. Cal. Aug. 29, 2018);[8] and *Apple Inc. v. Qualcomm Inc.*, No. 3:17-cv-00108-GPC-MDD, 2017 WL 3966944, at *1-3 (S.D. Cal. September 7, 2017). Those cases provide insight into Qualcomm's licensing and marketing practices. The Court also relies on representations by counsel at oral argument, and on the Court's familiarity with evidence and testimony in the trial of the related case, *Apple*. The background facts are intended only to provide context for the Court's decision.

Cellular communications depend on widely distributed networks that implement cellular communications standards that have evolved over four "generations." First-generation cellular communications standards were developed in the 1980s and those standards support analog transmissions of voice calls. Second-generation ("2G") cellular communications were developed in the early 1990s and those standards support digital transmissions of voice calls. The leading 2G standards are the Global System for Mobile

---

[7] In that case, the Federal Trade Commission alleged that Qualcomm violated anti-trust laws, in part, by conditioning the supply of its modem chips (or semiconductor baseband processors) on the purchase of its patents and by requiring anticompetitive exclusive dealing contracts. *FTC v. Qualcomm*, No. 17-CV-00220-LHK, 2019 WL 2206013, at *25-27. An important factor in the finding of anticompetitive behavior was Qualcomm's refusal to supply smart phone makers with its chipsets unless the original equipment manufacturers cross-licensed their own SEPs to Qualcomm. *Id.* at *4, *7, *26; *see also Fed. Trade Comm'n v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (granting motion to stay pending appeal).

[8] In a class action anti-trust suit by purchasers of cellphone handsets, the district court noted that although Qualcomm is required to license its cellular SEPs on FRAND terms to both original equipment manufacturers competing chip suppliers, Qualcomm's practice was to refuse to license its cellular SEPs to competing modem chip manufacturers. *See In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 288 (N.D. Cal. 2018).

Communications standard ("GSM") and second-generation Code Division Multiple Access standard ("2G-CDMA").

In the late 1990s, third-generation ("3G") cellular communications standards were introduced. The leading 3G standards are the Universal Mobile Telecommunications System ("UMTS") and third-generation Code Division Multiple Access ("3G-CDMA") standards. In late 2009, fourth-generation ("4G") cellular communications standards were introduced. These standards support substantially higher data-transmission speeds than 3G standards. 4G is an upgrade to 3G/UTMS/wideband CDMA ("WCDMA"). *Stern*, 19 Minn. J.L. Sci. & Tech. at 128. The leading 4G standard is Long-Term Evolution ("LTE"). Orthogonal frequency division multiple access ("OFDMA") is a technology used in the LTE standard. *See generally* Richard H. Stern, *Who Should Own the Benefits of Standardization and the Value It Creates?*, 19 Minn. J.L. Sci. & Tech. 107, 127-30 (2018) ("Stern"). The first generation of LTE was standardized in 2008, but there have been several new LTE releases as standards contributors develop new features. *FTC*, No. 17-CV-00220-LHK, 2019 WL 2206013, at *3.

Cellular communications standards, such as CDMA and LTE standards, are adopted by Standards Setting Organizations. Standards Setting Organizations that adopt cellular telecommunications standards include the Institute of Electrical and Electronics Engineers ("IEEE") in the U.S., the European Telecommunication Standards Institute ("ETSI"), the Telecommunications Industry Association, and the International Telecommunications Union. The specifications ensure that cellular industry participants—including modem chip suppliers, handset original equipment manufacturers, infrastructure companies, and carriers—develop standard-compatible

devices that can communicate with each other.  The Third Generation Partnership Project ("3GPP") and the Third Generation Partnership Project 2 ("3GPP2") are global collaborative partnerships of Standards Setting Organizations and other industry participants that develop technical specifications for cellular standards.  *FTC*, 2019 WL 2206013, at *2.  LTE uses OFDMA technology for downlink transmissions and single-carrier frequency division multiple access technology for uplink transmissions (*Id.*).  LTE was standardized by 3GPP (*Id.* at 4).

Patents that cover technology that is incorporated into a standard are known as SEPs. Parties that participate in the standards development process must commit to license their SEPs on FRAND terms to firms that implement the standard.  Standards Setting Organizations require participants to publicly disclose any claimed SEPs and promise to license [SEPs] to anyone who practices the standard on a royalty-free or FRAND basis.  *In re Qualcomm*, No. 17-MD-02773-LHK, 2018 WL 4110498, at *2. Generally, the Standards Setting Organizations' practice is to permit firms simply to declare which of their patents are SEPs and the Standards Setting Organizations do not have a mechanism for verifying the essentiality of any patent to the technology embodied in a standard.  *Stern*, 19 Minn. J.L. Sci. & Tech. at 130 & n. 80.  Qualcomm holds thousands of FRAND-encumbered SEPs that comprise ETSI's 3G/UMTS and 4G/LTE cellular communication standards.  *Apple,* No. 3:17-cv-00108-GPC-MDD, 2017 WL 3966944, at *1.

In order to communicate with a cellular communications network, a cellphone handset must contain a semiconductor device known as a baseband processor, "modem chip," or "chipset."  More specifically, in order to communicate with a particular cellphone

network, the handset must contain a modem chip that complies with the cellular communications standards that the particular cellphone network supports.  Modem chips are either "single-mode" or "multimode."  Whereas a single-mode modem chip supports only one cellular standard (like CDMA or UMTS), a multimode modem chip supports multiple standards in one chip.  For example, a handset that contains a modem chip that complies only with UMTS standards cannot communicate with a cellular network that uses 3G-CDMA standards.  A "CDMA multimode" modem chip is a modem chip that supports CDMA and additional standards.  *See generally, In re Qualcomm*, No. 17-MD-02773-LHK, 2018 WL 41104982018, at \*2-\*5.

To be used on a network that deploys LTE—the leading 4G standard used by major cellular network operators—the handset must ordinarily contain a multi-mode baseband processor that complies with LTE standards and is also "backward compatible" with 2G and 3G standards.  *See Stern, 19 Minn. J.L. Sci. & Tech. at 131-32, 138*.  This is because LTE network infrastructure generally supports data, rather than voice, traffic and therefore, to transmit voice calls, a baseband processor must comply with 2G and 3G standards.  *Id.* at 132.  Also, network operators have continued to use the prior standards and have not yet replaced their 2G and 3G infrastructure with the new 4G infrastructure.  *Id.*  Accordingly, most manufacturers must purchase multimode chips in order to make mobile phones that can function on the major U.S. wireless networks.  Cellular handsets are produced by original equipment manufacturers such as the defendants herein.

Qualcomm is the leading supplier of modem chips to original equipment manufacturers worldwide.  In particular, Qualcomm is dominant in the supply of two types of modem chips: (1) modem chips that comply with CDMA standards ("CDMA modem

chips"); and (2) modem chips for use in premium tier handsets, which comply with advanced LTE standards ("premium-LTE modem chips").

At some point in the early 1990s, Qualcomm started licensing to only original equipment manufacturers at a 5% running royalty on the price of each handset sold. *FTC v. Qualcomm*, No. 17-CV-00220-LHK, 2019 WL 2206013, at \*4. These licenses are called Subscriber Unit License Agreements ("SULAs") and with a SULA, an original equipment manufacturer may sell handsets that practice Qualcomm's patents without fear of an infringement suit from Qualcomm. *Id.* Qualcomm SULAs grant rights both to the relevant Qualcomm patents existing at the time of the SULA and additional relevant Qualcomm patents issued during the license term. *Id.* Qualcomm SULAs also require original equipment manufacturers to cross-license their own SEP patents to Qualcomm, sometimes on a royalty-free basis. *Id.*

In the *FTC v. Qualcomm* case, the Court described Qualcomm's anticompetitive conduct as follows:

> In a practice that Qualcomm concedes is unique within Qualcomm and unique in the industry, Qualcomm refuses to sell modem chips to an original equipment manufacturer until the original equipment manufacturer signs a separate patent license agreement. Thus, Qualcomm refuses to sell an original equipment manufacturer modem chips exhaustively. Under the doctrine of patent exhaustion, "the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Comp., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). Thus, patent exhaustion provides that when a consumer purchases a television, the consumer does not have to separately sign a license and pay royalties for any patents practiced by the television.

> To avoid exhaustion and to enforce Qualcomm's practice of requiring a separate patent license before selling modem chips, Qualcomm wields its chip monopoly power to coerce original equipment manufacturers to sign patent license agreements.

*FTC*, No. 17-CV-00220-LHK, 2019 WL 2206013, at \*26.

11

D.     The Parties' Arguments

The defendants argue they have a license to use the technology in their allegedly infringing phones by virtue of an agreement that Qualcomm, their supplier of chipsets, and LGE, the original assignee of '373 Patent, entered into in 1993, and amended several times thereafter.  They contend that in the agreement, as amended, LGE agreed not to assert its patents against Qualcomm's customers, including the defendants.  They argue that Evolved purchased the patents at issue from LGE subject to the encumbrance.  They also argue that Evolved's patent infringement action is barred under the doctrine of patent exhaustion.  They contend that the patent rights in the '373 patent have been exhausted by Qualcomm's sale of its baseband chipsets to the defendants for use in the accused devices.

Evolved argues that the technology covered under the Qualcomm-LGE license is limited to that which is necessary for a specific group of defined wireless communications. It contends that ███████████████████████████████████████████

████████    ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████    It contends the covenants encompassed in the licensing agreements encumber only technology that ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

In response to Evolved's argument, the defendants concede ████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

## II.   FACTS

Evolved initially asserted infringement of five patents that are part of a portfolio of patents that it acquired from a related entity, TQ Lambda, in September 2014.   TQ Lambda had purchased the patents from LGE.   D.I. 227, Jay Decl., Ex. J, PPA.   Evolved owns the patents-in-suit by assignment from LGE.   D.I. 1, Complaint at ¶ 15.   TQ Lambda purchased the patents-in-suit from LGE in January 2014, and sold them to Evolved in September 2014.   *Id.*   The application for the '373 patent was filed on October 27, 2006, and the inventors of the '373 Patent assigned the entire right, title and interest in the '373 patent to LGE on November 2, 2006.   D.I. 1, Complaint.   LGE declared the '373 patent essential to the LTE standard.   *Id.* at 16.

Evolved alleges LGE is a member of ETSI and participated extensively in the 3GPP Working Group meetings to develop the LTE standards (*Id.* at 15).   It alleges the patents-in-suit are essential to the 3GPP 36 Series technical specifications, which cover the LTE standards.   *Id.*   Ultimately the parties stipulated to dismissal of these three patents, leaving only two patents-in-suit:  the '373 Patent and '236 Patent.[9]

---

[9] The Federal Circuit recently affirmed (under Federal Circuit Rule 36) the Patent Trial and Appeal Board's Final Written Decision invalidating claims 1-10, 12, and 13 of U.S. Patent No. 7,881,236 B2 (D.I.

Evolved accuses the defendants of infringing the '373 Patent in connection with numerous of the defendant's products that are compatible with LTE networks.  D.I. 1, Complaint at 22.  The accused products and/or methods are allegedly covered by one or more claims of the '373 Patent, including but not limited to cellular telephones, tablet computers, and/or other devices with LTE capabilities and that comply with the LTE standards, including at least TS ("Technical Specification") 36.211, .300, .321, .331, and .423.  *Id.*  With the exceptions of certain of Samsung's and Motorola's accused products, all of the accused products contain Qualcomm baseband chipsets.  D.I. 225, Defendants' Brief at 9 n. 4.  The defendants limit their motions for summary judgment to those accused products that contain Qualcomm chipsets.  *Id.*[10]

A.      Licensing Agreement and Amendments



---

480-1, Ex. A, *Evolved Wireless, LLC v. ZTE (USA) Inc.*, *et al.*, Nos. 2018-2008, 2018-2009, 2018-2010, 2018-2011 (Fed. Cir. October 4, 2019)).
[10] At the hearing, defendants' counsel stated that there is no dispute that he thought "every phone involved in this case is a multi-mode phone."  D.I. 481, Tr. at 64.













The defendants have also shown that the accused products that incorporate Qualcomm baseband chipsets are capable of communication on LTE cellular wireless carrier networks and are also capable of communication on wireless networks incorporating CDMA or WCDMA technologies, e.g., lx-EVDO Rev. A, lx-EVDO Rev. B, UMTS, HSPA, HSPA+, and HSDPA.  D.I. 229, Appendix B.

B.      LGE-TQ Lambda Patent Purchase Agreement

LGE agreed to sell "all right, title, and interest in [certain patents including the '373 Patent] and applications and the causes of action to sue for infringement thereof and other enforcement rights" to TQ Lambda on January 24, 2014.  D.I. 227, Ex. J, PPA at 1. TQ Lambda agreed to purchase from LGE "all right, title, and interest in the Assigned Patent Rights, free and clear of any restrictions, liens, claims, and encumbrances except as set forth in *Exhibit B*."  *Id.* (emphasis in original).

████████████████████████████████████████████████████████

████████████████████████████    Also attached to the PPA is Exhibit C, an "ETSI

Declaration by LG Electronics." *Id.*, Ex. C.  With respect to the '373 Patent, under the

heading "Essential to projects" are listed the following

> 3GPP-Release-8 (GSM Phase 2+ and UMTS/LTE release 8) LTE (Rel-8
> LTE - 3G Long Term Evolution - Evolved Packet System RAN part)

*Id.*  Under the heading, "Essential to standards YES to ETSI FRAND license," in Ex. C,

are listed the following:  TS 36.300, TS 36.321, TS 36.331, and TS 36.423. *Id.*[12]

████████████████████████████████████████████████████████

████████████████████    *Id.* at 3.████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[12] These are the ETSI technical specifications that are referred to in Evolved's complaint. D.I. 1,
Complaint at 22.

Under the heading "Existing Licenses and Obligations," the seller warrants that that "none of the Assigned Patent Rights have been declared essential to any standard of any standard setting organization, except the Patents may have been declared essential to the standard setting organization ETSI as set forth in *Exhibit C*," but also states that "excluding those indicated in **Exhibit A**, "none of the Patents have been evaluated or submitted for review related to a determination that such Patents are essential for practicing a standard related to cellular telecommunications. Further, none of the Patents have been determined to be non-essential for practicing a standard related to cellular telecommunications." *Id.* at 9, § 6.3. The patents acquired by TQ Lambda are listed in Exhibit A, and the '373 Patent is noted as "submitted for evaluation." *Id.*, Ex. A.

The parties entered into the Agreement acknowledging that "in negotiating the Payment, the Seller and Purchaser have expressly taken into account the substantial uncertainty in the relevant markets as they currently exist and the substantial uncertainty regarding factors likely to impact use of the patented technology in coming years." D.I. 227, Jay Decl., Ex. J, PPA at 6, § 3.4.1(d).

III.   Law

A.   Summary Judgment Standards

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  If

"reasonable minds could differ as to the import of the evidence," summary judgment should not be granted.  *Id.* at 251.

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences.  *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003).  "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations."  *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."  *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004).

B.      Patent Exhaustion

"The Patent Act grants patentees the 'right to exclude others from making, using, offering for sale, or selling [their] invention[s].'"  *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1531 (2017) (quoting 35 U.S.C. § 154(a)).  The doctrine of patent exhaustion imposes a limit on that right to exclude.  *Id.*  "The limit functions automatically: When a patentee chooses to sell an item, that product 'is no longer within the limits of the monopoly' and instead becomes the 'private, individual property' of the purchaser, with the rights and benefits that come along with ownership."  *Id.*, (quoting *Bloomer v. McQuewan*, 14 How. 539, 549-50 (1853)).  "A patentee is free to set the price and negotiate contracts with purchasers, but may not, '*by virtue of his patent*, control the use or disposition' of the product after ownership passes to the purchaser."  *Id.* (quoting *United States v. Univis Lens Co.*, 316 U.S. 241, 250 (1942) (emphasis added by Supreme Court).  "The sale 'terminates all patent rights to that item.'"  *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008).  "Patent exhaustion is an affirmative defense to a claim of

24

patent infringement." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373 (Fed. Cir. 2013).

A covenant not to sue for patent infringement is equivalent to a patent license. *See TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275, 1276 (Fed. Cir. 2009) (stating "The real question, then, is not whether an agreement is framed in terms of a 'covenant not to sue' or a 'license.' That difference is only one of form, not substance—both are properly viewed as "authorizations."); *see also De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 242 (1927) ("As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee"). "[P]atent license agreements can be written to convey different scopes of promises not to sue, *e.g.*, a promise not to sue under a specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future." *De Forest Radio*, 273 U.S. at 242.

"Under California law, the interpretation of a contract is a question of law" that "is governed by the objective intent of the parties as embodied in the words of the contract." *Semitool, Inc. v. Dynamic Micro Sys.*, 444 F.3d 1337, 1341 (Fed. Cir. 2006) (citation omitted). California law prohibits the admission of parol evidence: (i) to insert an additional term into a written contract, if the contract is a complete and exclusive statement of the terms of the agreement, and/or (ii) to influence the meaning of contract terms where no ambiguity exists. *TransCore*, 563 F.3d at 1277; *see also* Cal. Civ. Proc. Code § 1856(b), (d), and (g); *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644–45 (Cal. 1968). The district court may receive and consider extrinsic evidence to determine whether one or more terms of a contract is reasonably

susceptible to multiple meanings, but once the district court determines that no ambiguity exists, extrinsic evidence is properly not admitted.  *TransCore*, 563 F.3d at 1277 n.2; *see Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60 (Cal. 2006); *Pac. Gas & Elec.*, 442 P.2d at 644–45.

IV.   DISCUSSION

The Court agrees with the defendants that the plaintiff's action is barred under the doctrine of patent exhaustion.  ████████████████████████████████

████████████████████████████████████████████████████

████████████████████   In the Agreements and Amendments,  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████   Whether Qualcomm's and/or LGE's licensing and/or business practices are otherwise illegal, unfair, anticompetitive, or oppressive is not a question for this Court.

The Court agrees with the defendants that the 1993 SULA Agreement, as amended in particular  ██████████████████████████████████████████

██████████   ██████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████   ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████   With respect to multi-mode products, the 1993 SULA Agreement and its various permutations continued to apply until Evolved's  ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████

The Court finds the 1993 SULA Agreement, as amended, covers the defendants' multimode, Qualcomm-based products. ████████████████████████

███████████████████████████████████████████████

████████████████████████████████ Evolved inherited LGE's covenants through purchase of the '373 patent and is therefore precluded from asserting claims for infringement of the '373 patent against products that incorporate Qualcomm baseband chipsets, including many of the defendants' accused products.

The Court finds that Evolved advocates an unreasonably narrow interpretation of the Qualcomm-LGE SULA Agreement. Its position that ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████ LGE's cross-license/covenant not to sue precludes an infringement action by Evolved against Qualcomm customers. Even in the absence of such a provision, the

█████████████████████████████ gives rise to patent exhaustion that bars Evolved's claims against the defendants.

The record shows the asserted patent is █████████████████████ ███████████████████████████████   █████████████████ █████████████████████████████████████████████   The license agreement extends to ████████████████████████████ ███████████████████   LGE declared the '373 Patent to be a standard essential patent.   Evolved alleges in its Complaint that the defendants' various mobile devices infringe patents that have been declared essential to the LTE wireless communications standards.   Evolved's infringement allegations are directed to the functionality that the Qualcomm chipsets provide.

Because phones containing patents essential to the LTE technology must work on older networks that employ 2G and 3G technology, the '373 Patent is also commercially necessary.   Logically, it would be difficult to market a cellphone that would not work where 4G was unavailable.   The Court rejects the plaintiff's analogy comparing the functionality of the '373 Patent to a CD player in a car—"a great feature . . . but not necessary to make an automobile." D.I. 481, Tr. at 31.   The Court finds SEPs are more analogous to first gear and fifth gear in a transmission since the difference between 3G and 4G is speed. A car that ran only in first gear would not be commercially viable.   It is clear to the Court that the evolving technology builds on earlier standards.

A review of the Agreements and Amendments, as redacted, shows █████████ ███████████████████████████████████   ███████████████ █████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████

Evolved knew by virtue of the exhibits attached to the PPA that the '373 Patent had been declared an ETSI SEP. ████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████ The PPA explicitly stated that there had been no determination as to the validity, infringement, or actual essentiality of the purchased IPR.

This interpretation comports with what appear to be Qualcomm's licensing and marketing strategy, whereby it attempted to maintain its monopoly in both the CDMA and premium LTE chip markets and to impose an anticompetitive surcharge on its competitors' chips.  Although the anticompetitive conduct is not before the Court, Qualcomm's background business practices support the Court's interpretation of the Agreements at issue.

Accordingly, the Court finds the defendants are entitled to prevail on their licensing/covenant defense.  Evolved's claims against the defendants for infringement of the '373 Patent are barred ████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

Unfortunately for Evolved, it purchased the LGE intellectual property subject to the Qualcomm encumbrance.  It has not shown that the intellectual property that it purchased from LGE falls outside the purview of ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ The fact that Qualcomm's licensing practices may have been anti-competitive does not affect the Court's interpretation of the contracts.  ████████████████████████████

████████████████████████████████████████████

████████████

Also, the doctrine of patent exhaustion bars the plaintiff's infringement claims.  As a matter of patent law, "the authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article."  *Quanta Computer, Inc. v. LG Elecs., Inc.*, 128 S. Ct. 2109, 2122 (2008).  Qualcomm sold its chipsets to LGE, exhausting its patent rights and required LGE to cross-license its patents, without a royalty, in order to purchase the chipsets.  Qualcomm and/or LGE may have used licensing restrictions to essentially claw back rights that patent exhaustion extinguished, but the fact remains that their patent rights were exhausted.  Evolved acquired the IPR with the knowledge that the rights it purchased were on shaky ground.

In view of the foregoing, counterclaims for breach of contract are moot. Accordingly,

IT IS ORDERED that:

1.    Defendant HTC's Motion for Summary Judgment (D.I. 205 in 1:15cv543) is granted.

2.    Defendants Lenovo Corp.'s and Motorola Mobility, LLC's motion for summary judgment (D.I. 184 in 1:15cv544) is granted with respect to their accused products that contain Qualcomm-based chipsets.

3.    Defendants Samsung Elecs. Co., Samsung Elecs. Am. Inc.'s Motion for summary judgment (D.I. 224 in 1:15cv545) is granted with respect to their accused products that contain Qualcomm baseband chipsets.

4.    Defendant ZTE (USA) Corp.'s motion for summary judgment (D.I. 197 in 1:15cv546) is granted.

5.    Defendant Microsoft Corp.'s motion for summary judgment (D.I. 197 in 1:15cv547) is granted.

6.    The parties' Stipulation to Stay Proceedings Pending Resolution of Appeals (D.I. 432 in 1:15cv543; D.I. 394 in 1:15cv544;  D.I. 477 in 1:15cv545; and D.I. 397 in 1:15cv546; D.I. 415 in 1:15cv547) is hereby adopted; to the extent any issues are not resolved in this order, these actions are stayed pending resolution of the appeal in *Evolved Wireless LLC v. Apple Inc.*, No. 1:15cv542.

7.    The plaintiff's motions for summary judgment on the defendants' counterclaims for breach of contract (D.I. 205 in 1:15cv543; D.I. 184 in 1:15cv544; D.I. 197 in 1:15cv546; and D.I. 197 in 1:15cv547) are denied as moot.

8.     A judgment of dismissal will be entered.

9.     Given that the Court has relied upon material that technically remains under seal, the Court is releasing this Memorandum Order under seal, pending review by the parties.  In the event that the parties believe that certain material in this Memorandum Order should be redacted, the parties should jointly submit a proposed redacted version within one week of the date of this Order.  The Court will subsequently issue a publicly available version of its Memorandum Order.

DATED this 3rd day of December 2019.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge